ATTACHMENT

(Slip Opinion)            OCTOBER TERM, 2003            1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BLAKELY *v.* WASHINGTON

### CERTIORARI TO THE COURT OF APPEALS OF WASHINGTON

No. 02–1632.  Argued March 23, 2004—Decided June 24, 2004

Petitioner pleaded guilty to kidnaping his estranged wife. The facts
admitted in his plea, standing alone, supported a maximum sentence
of 53 months, but the judge imposed a 90-month sentence after find-
ing that petitioner had acted with deliberate cruelty, a statutorily
enumerated ground for departing from the standard range. The
Washington Court of Appeals affirmed, rejecting petitioner's argu-
ment that the sentencing procedure deprived him of his federal con-
stitutional right to have a jury determine beyond a reasonable doubt
all facts legally essential to his sentence.

*Held:* Because the facts supporting petitioner's exceptional sentence
were neither admitted by petitioner nor found by a jury, the sentence
violated his Sixth Amendment right to trial by jury. Pp. 5–18.

    (a) This case requires the Court to apply the rule of *Apprendi* v.
*New Jersey*, 530 U. S. 466, 490, that, "[o]ther than the fact of a prior
conviction, any fact that increases the penalty for a crime beyond the
prescribed statutory maximum must be submitted to a jury, and
proved beyond a reasonable doubt." The relevant statutory maxi-
mum for *Apprendi* purposes is the maximum a judge may impose
based solely on the facts reflected in the jury verdict or admitted by
the defendant. Here, the judge could not have imposed the 90-month
sentence based solely on the facts admitted in the guilty plea, be-
cause Washington law requires an exceptional sentence to be based
on factors other than those used in computing the standard-range
sentence. Petitioner's sentence is not analogous to those upheld in
*McMillan* v. *Pennsylvania*, 477 U. S. 79, and *Williams* v. *New York*, 337
U. S. 241, which were not greater than what state law authorized based
on the verdict alone. Regardless of whether the judge's authority to im-
pose the enhanced sentence depends on a judge's finding a specified
fact, one of several specified facts, or any aggravating fact, it remains

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 02–1632

## RALPH HOWARD BLAKELY, JR., PETITIONER v. WASHINGTON

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF WASHINGTON, DIVISION 3

[June 24, 2004]

JUSTICE SCALIA delivered the opinion of the Court.

Petitioner Ralph Howard Blakely, Jr., pleaded guilty to the kidnaping of his estranged wife. The facts admitted in his plea, standing alone, supported a maximum sentence of 53 months. Pursuant to state law, the court imposed an "exceptional" sentence of 90 months after making a judicial determination that he had acted with "deliberate cruelty." App. 40, 49. We consider whether this violated petitioner's Sixth Amendment right to trial by jury.

I

Petitioner married his wife Yolanda in 1973. He was evidently a difficult man to live with, having been diagnosed at various times with psychological and personality disorders including paranoid schizophrenia. His wife ultimately filed for divorce. In 1998, he abducted her from their orchard home in Grant County, Washington, binding her with duct tape and forcing her at knifepoint into a wooden box in the bed of his pickup truck. In the process, he implored her to dismiss the divorce suit and related trust proceedings.

When the couple's 13-year-old son Ralphy returned

(36-month firearm enhancement).[3]  A judge may impose a
sentence above the standard range if he finds "substantial
and compelling reasons justifying an exceptional sen-
tence." §9.94A.120(2).   The Act lists aggravating factors
that justify such a departure, which it recites to be illus-
trative rather than exhaustive. §9.94A.390.  Nevertheless,
"[a] reason offered to justify an exceptional sentence can
be considered only if it takes into account factors other
than those which are used in computing the standard
range sentence for the offense."  *State* v. *Gore*, 143 Wash.
2d 288, 315–316, 21 P. 3d 262, 277 (2001).  When a judge
imposes an exceptional sentence, he must set forth find-
ings of fact and conclusions of law supporting it.
§9.94A.120(3).  A reviewing court will reverse the sentence
if it finds that "under a clearly erroneous standard there is
insufficient evidence in the record to support the reasons
for imposing an exceptional sentence."  *Gore*, *supra*, at
315, 21 P. 3d, at 277 (citing §9.94A.210(4)).

Pursuant to the plea agreement, the State recommended
a sentence within the standard range of 49 to 53 months.
After hearing Yolanda's description of the kidnap-
ing, however, the judge rejected the State's recom-
mendation and imposed an exceptional sentence of 90
months—37 months beyond the standard maximum.
He justified the sentence on the ground that petitioner
had acted with "deliberate cruelty," a statutorily enumer-
ated ground for departure in domestic-violence cases.
§9.94A.390(2)(h)(iii).[4]

---

[3]The domestic-violence stipulation subjected petitioner to such
measures as a "no-contact" order, see §10.99.040, but did not increase
the standard range of his sentence.

[4]The judge found other aggravating factors, but the Court of Appeals
questioned their validity under state law and their independent suffi-
ciency to support the extent of the departure. See 111 Wash. App. 851,
868–870, and n. 3, 47 P. 3d 149, 158–159, and n. 3 (2002).  It affirmed

Opinion of the Court

Court's rejection of a similar challenge in *Gore, supra,* at 311–315, 21 P. 3d, at 275–277. The Washington Supreme Court denied discretionary review. 148 Wash. 2d 1010, 62 P. 3d 889 (2003). We granted certiorari. 540 U. S. 965 (2003).

## II

This case requires us to apply the rule we expressed in *Apprendi* v. *New Jersey,* 530 U. S. 466, 490 (2000): "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." This rule reflects two longstanding tenets of common-law criminal jurisprudence: that the "truth of every accusation" against a defendant "should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours," 4 W. Blackstone, Commentaries on the Laws of England 343 (1769), and that "an accusation which lacks any particular fact which the law makes essential to the punishment is . . . no accusation within the requirements of the common law, and it is no accusation in reason," 1 J. Bishop, Criminal Procedure §87, p. 55 (2d ed. 1872).[5] These principles have been

---

[5] JUSTICE BREYER cites JUSTICE O'CONNOR's *Apprendi* dissent for the point that this Bishop quotation means only that indictments must charge facts that trigger statutory aggravation of a common-law offense. *Post,* at 14 (dissenting opinion). Of course, as he notes, JUSTICE O'CONNOR was referring to an entirely different quotation, from *Archbold's* treatise. See 530 U. S., at 526 (citing J. Archbold, Pleading and Evidence in Criminal Cases 51, 188 (15th ed. 1862)). JUSTICE BREYER claims the two are "similar," *post,* at 14, but they are as similar as chalk and cheese. Bishop was not "addressing" the "problem" of statutes that aggravate common-law offenses. *Ibid.* Rather, the entire chapter of his treatise is devoted to the point that "every fact which is legally essential to the punishment" must be charged in the indictment and proved to a jury. 1 J. Bishop, Criminal Procedure, ch. 6, pp. 50–56 (2d ed. 1872). As one "example" of this principle (appearing several

Opinion of the Court

have imposed under state law without the challenged factual finding. *Apprendi, supra*, at 491–497; *Ring, supra*, at 603–609.

In this case, petitioner was sentenced to more than three years above the 53-month statutory maximum of the standard range because he had acted with "deliberate cruelty." The facts supporting that finding were neither admitted by petitioner nor found by a jury. The State nevertheless contends that there was no *Apprendi* violation because the relevant "statutory maximum" is not 53 months, but the 10-year maximum for class B felonies in §9A.20.021(1)(b). It observes that no exceptional sentence may exceed that limit. See §9.94A.420. Our precedents make clear, however, that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* See *Ring, supra*, at 602 ("'the maximum he would receive if punished according to the facts reflected in the jury verdict alone'" (quoting *Apprendi, supra*, at 483)); *Harris v. United States*, 536 U. S. 545, 563 (2002) (plurality opinion) (same); cf. *Apprendi, supra*, at 488 (facts admitted by the defendant). In other words, the relevant "statutory maximum" is not the *maximum sentence a judge may impose* after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," Bishop, *supra*, §87, at 55, and the judge exceeds his proper authority.

The judge in this case could not have imposed the exceptional 90-month sentence solely on the basis of the facts admitted in the guilty plea. Those facts alone were insufficient because, as the Washington Supreme Court has explained, "[a] reason offered to justify an exceptional sentence can be considered only if it takes into account

Opinion of the Court

departure in its regime are illustrative rather than exhaustive. This distinction is immaterial. Whether the judge's authority to impose an enhanced sentence depends on finding a specified fact (as in *Apprendi*), one of several specified facts (as in *Ring*), or *any* aggravating fact (as here), it remains the case that the jury's verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact.[8]

Because the State's sentencing procedure did not comply with the Sixth Amendment, petitioner's sentence is invalid.[9]

### III

Our commitment to *Apprendi* in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary. See Letter XV by the Federal Farmer (Jan. 18, 1788), reprinted in 2 The Complete Anti-Federalist 315, 320 (H. Storing ed. 1981) (describing the jury as "secur[ing] to the people at large, their

---

[8] Nor does it matter that the judge must, after finding aggravating facts, make a judgment that they present a compelling ground for departure. He cannot make that judgment without finding some facts to support it beyond the bare elements of the offense. Whether the judicially determined facts *require* a sentence enhancement or merely *allow* it, the verdict alone does not authorize the sentence.

[9] The United States, as *amicus curiae*, urges us to affirm. It notes differences between Washington's sentencing regime and the Federal Sentencing Guidelines but questions whether those differences are constitutionally significant. See Brief for United States as *Amicus Curiae* 25–30. The Federal Guidelines are not before us, and we express no opinion on them.

Opinion of the Court

The second alternative is that legislatures may establish legally essential sentencing factors *within limits*—limits crossed when, perhaps, the sentencing factor is a "tail which wags the dog of the substantive offense." *McMillan*, 477 U. S., at 88. What this means in operation is that the law must not go *too far*—it must not exceed the judicial estimation of the proper role of the judge.

The subjectivity of this standard is obvious. Petitioner argued below that second-degree kidnaping with deliberate cruelty was essentially the same as first-degree kidnaping, the very charge he had avoided by pleading to a lesser offense. The court conceded this might be so but held it irrelevant. See 111 Wash. App., at 869, 47 P. 3d, at 158.[11] Petitioner's 90-month sentence exceeded the 53-month standard maximum by almost 70%; the Washington Supreme Court in other cases has upheld exceptional sentences 15 times the standard maximum. See *State* v. *Oxborrow*, 106 Wash. 2d 525, 528, 533, 723 P. 2d 1123, 1125, 1128 (1986) (15-year exceptional sentence; 1-year standard maximum sentence); *State* v. *Branch*, 129 Wash. 2d 635, 650, 919 P. 2d 1228, 1235 (1996) (4-year exceptional sentence; 3-month standard maximum sentence).

---

prevent lawmakers from manipulating offense elements in this fashion. *Post*, at 10. But the many immediate practical advantages of judicial factfinding, see *post*, at 5–7, suggest that political forces would, if anything, pull in the opposite direction. *In any case, the Framers'* decision to entrench the jury-trial right in the Constitution shows that they did not trust government to make political decisions in this area.

[11] Another example of conversion from separate crime to sentence enhancement that JUSTICE O'CONNOR evidently does not consider going "too far" is the obstruction-of-justice enhancement, see *post*, at 6–7. Why perjury during trial should be grounds for a judicial sentence enhancement on the underlying offense, rather than an entirely separate offense to be found by a jury beyond a reasonable doubt (as it has been for centuries, see 4 W. Blackstone, Commentaries on the Laws of England 136–138 (1769)), is unclear.

Opinion of the Court

so. It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence—and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.

But even assuming that restraint of judicial power unrelated to the jury's role is a Sixth Amendment objective, it is far from clear that *Apprendi* disserves that goal. Determinate judicial-factfinding schemes entail less judicial power than indeterminate schemes, but more judicial power than determinate *jury*-factfinding schemes. Whether *Apprendi* increases judicial power overall depends on what States with determinate judicial-factfinding schemes would do, given the choice between the two alternatives. JUSTICE O'CONNOR simply assumes that the net effect will favor judges, but she has no empirical basis for that prediction. Indeed, what evidence we have points exactly the other way: When the Kansas Supreme Court found *Apprendi* infirmities in that State's determinate-sentencing regime in *State* v. *Gould*, 271 Kan. 394, 404–414, 23 P. 3d 801, 809–814 (2001), the legislature responded not by reestablishing indeterminate sentencing but by applying *Apprendi*'s requirements to its

Cite as: 542 U. S. ____ (2004)    15

Opinion of the Court

Nor do we see any merit to JUSTICE BREYER's contention that *Apprendi* is unfair to criminal defendants because, if States respond by enacting "17-element robbery crime[s]," prosecutors will have more elements with which to bargain. *Post*, at 4–5, 9 (citing Bibas, Judicial Fact-Finding and Sentence Enhancements in a World of Guilty Pleas, 110 Yale L. J. 1097 (2001)).  Bargaining already exists with regard to sentencing factors because defendants can either stipulate or contest the facts that make them applicable.  If there is any difference between bargaining over sentencing factors and bargaining over elements, the latter probably favors the defendant.  Every new element that a prosecutor can threaten to charge is also an element that a defendant can threaten to contest at trial and make the prosecutor prove beyond a reasonable doubt.  Moreover, given the sprawling scope of most criminal codes, and the power to affect sentences by making (even nonbinding) sentencing recommendations, there is already no shortage of *in terrorem* tools at prosecutors' disposal.  See King & Klein, *Apprendi* and Plea Bargaining, 54 Stan. L. Rev. 295, 296 (2001) ("Every prosecutorial bargaining chip mentioned by Professor Bibas existed pre-*Apprendi* exactly as it does post-*Apprendi*").

Any evaluation of *Apprendi*'s "fairness" to criminal defendants must compare it with the regime it replaced, in which a defendant, with no warning in either his indictment or plea, would routinely see his maximum potential sentence balloon from as little as five years to as much as life imprisonment, see 21 U. S. C. §§841(b)(1)(A), (D),[13]

_____

factfinding.  JUSTICE BREYER's argument rests entirely on a speculative prediction about the number of defendants likely to choose the first (rather than the second) option if denied the third.

[13] To be sure, JUSTICE BREYER and the other dissenters would forbid those increases of sentence that violate the constitutional principle that *tail shall not wag dog*.  The source of this principle is entirely unclear.

Opinion of the Court

guarantees the *right* to jury trial. It does not guarantee that a particular number of jury trials will actually take place. That more defendants elect to waive that right (because, for example, government at the moment is not particularly oppressive) does not prove that a constitutional provision guaranteeing *availability* of that option is disserved.

JUSTICE BREYER's more general argument—that *Apprendi* undermines alternatives to adversarial factfinding—is not so much a criticism of *Apprendi* as an assault on jury trial generally. His esteem for "non-adversarial" truth-seeking processes, *post*, at 12, supports just as well an argument against either. Our Constitution and the common-law traditions it entrenches, however, do *not* admit the contention that facts are better discovered by judicial inquisition than by adversarial testing before a jury. See 3 Blackstone, Commentaries, at 373–374, 379–381. JUSTICE BREYER may be convinced of the equity of the regime he favors, but his views are not the ones we are bound to uphold.

Ultimately, our decision cannot turn on whether or to what degree trial by jury impairs the efficiency or fairness of criminal justice. One can certainly argue that both these values would be better served by leaving justice entirely in the hands of professionals; many nations of the world, particularly those following civil-law traditions, take just that course. There is not one shred of doubt, however, about the Framers' paradigm for criminal justice: not the civil-law ideal of administrative perfection, but the common-law ideal of limited state power accomplished by strict division of authority between judge and jury. As *Apprendi* held, every defendant has the *right* to insist that the prosecutor prove to a jury all facts legally essential to the punishment. Under the dissenters' alternative, he has no such right. That should be the end of the matter.

Cite as: 542 U. S. ____ (2004)          1

O'CONNOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 02–1632

## RALPH HOWARD BLAKELY, JR., PETITIONER *v.* WASHINGTON

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF WASHINGTON, DIVISION 3

[June 24, 2004]

JUSTICE O'CONNOR, with whom JUSTICE BREYER joins, and with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join as to all but Part IV–B, dissenting.

The legacy of today's opinion, whether intended or not, will be the consolidation of sentencing power in the State and Federal Judiciaries. The Court says to Congress and state legislatures: If you want to constrain the sentencing discretion of judges and bring some uniformity to sentencing, it will cost you—dearly. Congress and States, faced with the burdens imposed by the extension of *Apprendi* to the present context, will either trim or eliminate altogether their sentencing guidelines schemes and, with them, 20 years of sentencing reform. It is thus of little moment that the majority does not expressly declare guidelines schemes unconstitutional, *ante,* at 12; for, as residents of "*Apprendi*-land" are fond of saying, "the relevant inquiry is one not of form, but of effect." *Apprendi* v. *New Jersey,* 530 U. S. 466, 494 (2000); *Ring* v. *Arizona,* 536 U. S. 584, 613 (2002) (SCALIA, J., concurring). The "effect" of today's decision will be greater judicial discretion and less uniformity in sentencing. Because I find it implausible that the Framers would have considered such a result to be required by the Due Process Clause or the Sixth Amendment, and because the practical consequences of today's decision may be disastrous, I respectfully dis-

Cite as: 542 U. S. ____ (2004)          3

O'CONNOR, J., dissenting

the initial sentencing or at the parole stage, can be traced directly to the unfettered discretion the law confers on those judges and parole authorities responsible for imposing and implementing the sentence"). Indeed, rather than reflect legally relevant criteria, these disparities too often were correlated with constitutionally suspect variables such as race. Boerner & Lieb 126–128. See also Breyer, The Federal Sentencing Guidelines and Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 5 (1988) (elimination of racial disparity one reason behind Congress' creation of the Federal Sentencing Commission).

To counteract these trends, the state legislature passed the Sentencing Reform Act of 1981. The Act had the laudable purposes of "mak[ing] the criminal justice system accountable to the public," and "[e]nsur[ing] that the punishment for a criminal offense is proportionate to the seriousness of the offense . . . [and] commensurate with the punishment imposed on others committing similar offenses." Wash. Rev. Code Ann. §9.94A.010 (2000). The Act neither increased any of the statutory sentencing ranges for the three types of felonies (though it did eliminate the statutory mandatory minimum for class A felonies), nor reclassified any substantive offenses. 1981 Wash. Laws ch. 137, p. 534. It merely placed meaningful constraints on discretion to sentence offenders within the statutory ranges, and eliminated parole. There is thus no evidence that the legislature was attempting to manipulate the statutory elements of criminal offenses or to circumvent the procedural protections of the Bill of Rights. Rather, lawmakers were trying to bring some much-needed uniformity, transparency, and accountability to an otherwise "'labyrinthine' sentencing and corrections system that 'lack[ed] any principle except unguided discretion.'" Boerner & Lieb 73 (quoting F. Zimring, Making the Punishment Fit the Crime: A Consumers' Guide to Sentencing Reform, Occasional Paper No. 12, p. 6 (1977)).

O'CONNOR, J., dissenting

namely, its "presumptive range[s]" and limits on the
imposition of "exceptional sentences" outside of those
ranges. *Id.,* at 128. For instance, sentencing judges still
retain unreviewable discretion in first-time offender cases
and in certain sex offender cases to impose alternative
sentences that are far more lenient than those contem-
plated by the guidelines. To the extent that unjustifiable
racial disparities have persisted in Washington, it has
been in the imposition of such alternative *sentences:* "The
lesson is powerful: racial disparity is correlated with
unstructured and unreviewed discretion." *Ibid.*; see also
Washington State Minority and Justice Commission, R.
Crutchfield, J. Weis, R. Engen, & R. Gainey, Racial/Ethnic
Disparities and Exceptional Sentences in Washington
State, Final Report 51–53 (1993) ("[E]xceptional sentences
are not a major source of racial disparities in sentencing").

The majority does not, because it cannot, disagree that
determinate sentencing schemes, like Washington's, serve
important constitutional values. *Ante,* at 12. Thus, the
majority says: "[t]his case is not about whether *determi-*
nate sentencing is constitutional, only about how it can be
implemented in a way that respects the Sixth Amend-
ment." *Ibid.* But extension of *Apprendi* to the present
context will impose significant costs on a legislature's
determination that a particular fact, not historically an
element, warrants a higher sentence. While not a consti-
tutional prohibition on guidelines schemes, the majority's
decision today exacts a substantial constitutional tax.

The costs are substantial and real. Under the majority's
approach, any fact that increases the upper bound on a
judge's sentencing discretion is an element of the *offense.*
Thus, facts that historically have been taken into account
by sentencing judges to assess a sentence within a broad
range—such as drug quantity, role in the offense, risk of
bodily harm—all must now be charged in an indictment
and submitted to a jury, *In re Winship,* 397 U. S. 358

O'CONNOR, J., dissenting

as to constitute an already-existing separate offense, unless the legislature is willing to undertake the unlikely expense of criminalizing relatively minor obstructive behavior.

Likewise, not all facts that historically have been relevant to sentencing always will be known prior to trial. For instance, trial or sentencing proceedings of a drug distribution defendant might reveal that he sold primarily to children. Under the majority's approach, a State wishing such a revelation to result in a higher sentence within a pre-existing statutory range either must vest judges with sufficient discretion to account for it (and trust that they exercise that discretion) *or* bring a separate criminal prosecution. Indeed, the latter choice might not be available—a separate prosecution, if it is for an aggravated offense, likely would be barred altogether by the Double Jeopardy Clause. *Blockburger* v. *United States,* 284 U. S. 299 (1932) (cannot prosecute for separate offense unless the two offenses both have at least one element that the other does not).

The majority may be correct that States and the Federal Government will be willing to bear some of these costs. *Ante,* at 13–14. But simple economics dictate that they will not, and cannot, bear them all. To the extent that they do not, there will be an inevitable increase in judicial discretion with all of its attendant failings.[1]

---

[1] The paucity of empirical evidence regarding the impact of extending *Apprendi* v. *New Jersey,* 530 U. S. 466 (2000), to guidelines schemes should come as no surprise to the majority. *Ante,* at 13. Prior to today, only one court had ever applied *Apprendi* to invalidate application of a guidelines scheme. Compare *State* v. *Gould,* 271 Kan. 394, 23 P. 3d 801 (2001), with, *e.g., United States* v. *Goodine,* 326 F. 3d 26 (CA1 2003); *United States* v. *Luciano,* 311 F. 3d 146 (CA2 2002); *United States* v. *DeSumma,* 272 F. 3d 176 (CA3 2001); *United States* v. *Kinter,* 235 F. 3d 192 (CA4 2000); *United States* v. *Randle,* 304 F. 3d 373 (CA5 2002); *United States* v. *Helton,* 349 F. 3d 295 (CA6 2003); *United States* v.

O'CONNOR, J., dissenting

indeed the choice is between adopting a balanced case-by-case approach that takes into consideration the values underlying the Bill of Rights, as well as the history of a particular sentencing reform law, and adopting a rigid rule that destroys everything in its path, I will choose the former. See *Apprendi,* 530 U. S., at 552–554 (O'CONNOR, J., dissenting) ("Because I do not believe that the Court's 'increase in the maximum penalty' rule is required by the Constitution, I would evaluate New Jersey's sentence-enhancement statute by analyzing the factors we have examined in past cases" (citation omitted)).

But even were one to accept formalism as a principle worth vindicating for its own sake, it would not explain *Apprendi*'s, or today's, result. A rule of deferring to legislative labels has no less formal pedigree. It would be more consistent with our decisions leading up to *Apprendi*, see *Almendarez-Torres* v. *United States,* 523 U. S. 224 (1998) (fact of prior conviction not an element of aggravated recidivist offense); *United States* v. *Watts,* 519 U. S. 148 (1997) *(per curiam)* (acquittal of offense no bar to consideration of underlying conduct for purposes of guidelines enhancement); *Witte* v. *United States,* 515 U. S. 389 (1995) (no double jeopardy bar against consideration of uncharged conduct in imposition of guidelines enhancement); *Walton* v. *Arizona,* 497 U. S. 639 (1990) (aggravating factors need not be found by a jury in capital case); *Mistretta* v. *United States,* 488 U. S. 361 (1989) (Federal Sentencing Guidelines do not violate separation of powers); *McMillan* v. *Pennsylvania,* 477 U. S. 79 (1986) (facts increasing mandatory minimum sentence are not necessarily elements); and it would vest primary authority for defining crimes in the political branches, where it belongs. *Apprendi, supra,* at 523–554 (O'CONNOR, J., dissenting). It also would be easier to administer than the majority's rule, inasmuch as courts would not be forced to look behind statutes and regulations to determine whether a

Cite as: 542 U. S. ____ (2004)            11

O'CONNOR, J., dissenting

reaching as they are disturbing. *Washington's* sentencing system is by no means unique. Numerous other States have enacted guidelines systems, as has the Federal Government. See, *e.g.*, Alaska Stat. §12.55.155 (2003); Ark. Code Ann. §16–90–804 (Supp. 2003); Fla. Stat. §921.0016 (2003); Kan. Stat. Ann. §21–4701 *et seq.* (2003); Mich. Comp. Laws Ann. §769.34 (West Supp. 2004); Minn. Stat. §244.10 (2002); N. C. Gen. Stat. §15A–1340.16 (Lexis 2003); Ore. Admin. Rule §213–008–0001 (2003); 204 Pa. Code §303 *et seq.* (2004), reproduced following 42 Pa. Cons. Stat. Ann. §9721 (Purden Supp. 2004); 18 U. S. C. §3553; 28 U. S. C. §991 *et seq.* Today's decision casts constitutional doubt over them all and, in so doing, threatens an untold number of criminal judgments. Every *sentence* imposed under such guidelines in cases currently pending on direct appeal is in jeopardy. And, despite the fact that we hold in *Schriro* v. *Summerlin, post,* p. ___, that *Ring* (and *a fortiori Apprendi*) does not apply retroactively on habeas review, all criminal sentences imposed under the federal and state guidelines since *Apprendi* was decided in 2000 arguably remain open to collateral attack. See *Teague* v. *Lane,* 489 U. S. 288, 301 (1989) (plurality opinion) ("[A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final").[2]

The practical consequences for trial courts, starting

---

[2] The numbers available from the federal system alone are staggering. On March 31, 2004, there were 8,320 federal criminal appeals pending in which the defendant's sentence was at issue. Memorandum from Carl Schlesinger, Administrative Office of the United States Courts, to Supreme Court Library (June 1, 2004) (available in Clerk of the Court's case file). Between June 27, 2000, when *Apprendi* was decided, and March 31, 2004, there have been 272,191 defendants sentenced in federal court. Memorandum, *supra.* Given that nearly all federal sentences are governed by the Federal Sentencing Guidelines, the vast majority of these cases are Guidelines cases.

O'CONNOR, J., dissenting

§9.94A.120 (2000). The Act elsewhere provides a nonexhaustive list of aggravating factors that satisfy the definition. §9.94A.390. The Court flatly rejects respondent's argument that such soft constraints, which still allow Washington judges to exercise a substantial amount of discretion, survive *Apprendi*. *Ante*, at 8–9. This suggests that the hard constraints found throughout chapters 2 and 3 of the Federal Sentencing Guidelines, which require an increase in the sentencing range upon specified factual findings, will meet the same fate. See, *e.g.*, USSG §2K2.1 (increases in offense level for firearms offenses based on number of firearms involved, whether possession was in connection with another offense, whether the firearm was stolen); §2B1.1 (increase in offense level for financial crimes based on amount of money involved, number of victims, possession of weapon); §3C1.1 (general increase in offense level for obstruction of justice).

Indeed, the "extraordinary sentence" provision struck down today is as inoffensive to the holding of *Apprendi* as a regime of guided discretion could possibly be. The list of facts that justify an increase in the range is nonexhaustive. The State's "real facts" doctrine precludes reliance by sentencing courts upon facts that would constitute the elements of a different or aggravated offense. See Wash. Rev. Code Ann. §9.94A.370(2) (2000) (codifying "real facts" doctrine). If the Washington scheme does not comport with the Constitution, it is hard to imagine a guidelines scheme that would.

\*    \*    \*

What I have feared most has now come to pass: Over 20 years of sentencing reform are all but lost, and tens of thousands of criminal judgments are in jeopardy. *Apprendi*, 530 U. S., at 549–559 (O'CONNOR, J., dissenting); *Ring*, 536 U. S., at 619–621 (O'CONNOR, J., dissenting). I respectfully dissent.

KENNEDY, J., dissenting

the evolution of the law, is basic constitutional theory in action.

Sentencing guidelines are a prime example of this collaborative process. Dissatisfied with the wide disparity in sentencing, participants in the criminal justice system, including judges, pressed for legislative reforms. In response, legislators drew from these participants' shared experiences and enacted measures to correct the problems, which, as JUSTICE O'CONNOR explains, could sometimes rise to the level of a constitutional injury. As *Mistretta* recognized, this interchange among different actors in the constitutional scheme is consistent with the Constitution's structural protections.

To be sure, this case concerns the work of a state legislature, and not of Congress. If anything, however, this distinction counsels even greater judicial caution. Unlike *Mistretta*, the case here implicates not just the collective wisdom of legislators on the other side of the continuing dialogue over fair sentencing, but also the interest of the States to serve as laboratories for innovation and experiment. See *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting). With no apparent sense of irony that the effect of today's decision is the destruction of a sentencing scheme devised by democratically elected legislators, the majority shuts down alternative, nonjudicial, sources of ideas and experience. It does so under a faintly disguised distrust of judges and their purported usurpation of the jury's function in criminal trials. It tells not only trial judges who have spent years studying the problem but also legislators who have devoted valuable time and resources "calling upon the accumulated wisdom and experience of the Judicial Branch . . . on a matter uniquely within the ken of judges," *Mistretta*, *supra*, at 412, that their efforts and judgments were all for naught. Numerous States that have enacted sentencing guidelines similar to the one in Washington State are now

Cite as: 542 U. S. ____ (2004)    1

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 02–1632

## RALPH HOWARD BLAKELY, JR., PETITIONER *v.* WASHINGTON

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF WASHINGTON, DIVISION 3

[June 24, 2004]

JUSTICE BREYER, with whom JUSTICE O'CONNOR joins, dissenting.

The Court makes clear that it means what it said in *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000). In its view, the Sixth Amendment says that "'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury.'"  *Ante*, at 5 (quoting *Apprendi, supra,* at 490). "'[P]rescribed statutory maximum'" means the penalty that the relevant statute authorizes "solely on the basis of the facts reflected in the jury verdict."  *Ante*, at 7 (emphasis deleted).  Thus, a jury must find, not only the facts that make up the crime of which the offender is charged, but also all (punishment-increasing) facts about the *way* in which the offender carried out that crime.

It is not difficult to understand the impulse that produced this holding.  Imagine a classic example—a statute (or mandatory sentencing guideline) that provides a 10-year sentence for ordinary bank robbery, but a 15-year sentence for bank robbery committed with a gun.  One might ask why it should matter for jury trial purposes whether the statute (or guideline) labels the gun's presence (a) a *sentencing fact* about the way in which the offender carried out the *lesser* crime of ordinary bank robbery, or (b) a factual *element* of the *greater* crime of bank robbery with a gun?  If the Sixth Amendment re-

Cite as: 542 U. S. ____ (2004)    3

BREYER, J., dissenting

J.); *id.,* at 569–572 (BREYER, J., concurring in part and concurring in judgment); *Jones* v. *United States,* 526 U. S. 227, 254, 264–272 (1999) (KENNEDY, J., dissenting); *Monge* v. *California,* 524 U. S. 721, 728–729 (1998) (O'CONNOR, J.); *McMillan* v. *Pennsylvania,* 477 U. S. 79, 86–91 (1986) (REHNQUIST, C. J.).   At the risk of some repetition, I shall set forth several of the most important considerations here.  They lead me to conclude that I must again dissent.

I

The majority ignores the adverse consequences inherent in its conclusion.  As a result of the majority's rule, sentencing must now take one of three forms, each of which risks either impracticality, unfairness, or harm to the jury trial right the majority purports to strengthen.  This circumstance shows that the majority's Sixth Amendment interpretation cannot be right.

A

A first option for legislators is to create a simple, pure or nearly pure "charge offense" or "determinate" sentencing system.  See Breyer, The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest, 17 *Hofstra L. Rev.* 1, 8–9 (1988).  In such a system, an indictment would charge a few facts which, taken together, constitute a crime, such as robbery.  Robbery would carry a single sentence, say, five years' imprisonment.  And every person convicted of robbery would receive that sentence—just as, centuries ago, everyone convicted of almost any serious crime was sentenced to death.  See, *e.g.,* Lillquist, The Puzzling Return of Jury Sentencing: Misgivings About *Apprendi,* 82 N. C. L. Rev. 621, 630 (2004).

Such a system assures uniformity, but at intolerable costs.  First, simple determinate sentencing systems *im-*pose identical punishments on people who committed their

BREYER, J., dissenting

ferring power to prosecutors).

## B

A second option for legislators is to return to a system of indeterminate sentencing, such as California had before the recent sentencing reform movement. See *Payne* v. *Tennessee,* 501 U. S. 808, 820 (1991) ("With the increasing importance of probation, as opposed to imprisonment, as a part of the penological process, some States such as California developed the 'indeterminate sentence,' where the time of incarceration was left almost entirely to the penological authorities rather than to the courts"); Thompson, Navigating the Hidden Obstacles to Ex-Offender Reentry, 45 Boston College L. Rev. 255, 267 (2004) ("In the late 1970s, California switched from an indeterminate criminal sentencing scheme to determinate sentencing" (footnote omitted)). Under indeterminate systems, the length of the sentence is entirely or almost entirely within the discretion of the judge or of the parole board, which typically has broad power to decide when to release a prisoner.

When such systems were in vogue, they were criticized, and rightly so, for producing unfair disparities, including race-based disparities, in the punishment of similarly situated defendants. See, *e.g., ante,* at 2–3 (O'CONNOR, J., dissenting) (citing sources). The length of time a person spent in prison appeared to depend on "what the judge ate for breakfast" on the day of sentencing, on which judge you got, or on other factors that should not have made a difference to the length of the sentence. See Breyer, *supra,* at 4–5 (citing congressional and expert studies indicating that, before the United States Sentencing Commission Guidelines were promulgated, punishments for identical crimes in the Second Circuit ranged from 3 to 20 years' imprisonment and that sentences varied depending upon region, gender of the defendant, and race of the

BREYER, J., dissenting

of the oncoming *Apprendi* train. See *ante*, at 13–14 (citing *State* v. *Gould*, 271 Kan. 394, 404–414, 23 P. 3d 801, 809–814 (2001); Act of May 29, 2002, ch. 170, 2002 Kan. Sess. Laws pp. 1018–1023 (codified at Kan. Stat. Ann. §21–4718 (2003 Cum. Supp.)); Brief for Kansas Appellate Defender Office as *Amicus Curiae* 3–7). It is therefore worth exploring how this option could work in practice, as well as the assumptions on which it depends.

### 1

This option can be implemented in one of two ways. The first way would be for legislatures to subdivide each crime into a list of complex crimes, each of which would be defined to include commonly found sentencing factors such as drug quantity, type of victim, presence of violence, degree of injury, use of gun, and so on. A legislature, for example, might enact a robbery statute, modeled on robbery sentencing guidelines, that increases punishment depending upon (1) the nature of the institution robbed, (2) the (a) presence of, (b) brandishing of, (c) other use of, a firearm, (3) making of a death threat, (4) presence of (a) ordinary, (b) serious, (c) permanent or life threatening, bodily injury, (5) abduction, (6) physical restraint, (7) taking of a firearm, (8) taking of drugs, (9) value of property loss, etc. Cf. United States Sentencing Commission, Guidelines Manual §2B3.1 (Nov. 2003) (hereinafter USSG).

This possibility is, of course, merely a highly calibrated form of the "pure charge" system discussed in Part I–A, *supra*. And it suffers from some of the same defects. The prosecutor, through control of the precise charge, controls the punishment, thereby marching the sentencing system directly away from, not toward, one important guideline goal: rough uniformity of punishment for those who engage in roughly the same *real* criminal conduct. The artificial (and consequently unfair) nature of the resulting sentence is aggravated by the fact that prosecutors must

BREYER, J., dissenting

to plead guilty to those elements that, until recently, were commonly thought of as sentencing factors. As to those defendants, the fairness problem arises because States may very well decide that they will *not* permit defendants to carve subsets of facts out of the new, *Apprendi*-required 17-element robbery crime, seeking a judicial determination as to some of those facts and a jury determination as to others. Instead, States may simply require defendants to plead guilty to all 17 elements or proceed with a (likely prejudicial) trial on all 17 elements.

The majority does not deny that States may make this choice; it simply fails to understand *why* any State would want to exercise it. *Ante*, at 14, n. 12. The answer is, as I shall explain in a moment, that the alternative may prove too expensive and unwieldy for States to provide. States that offer defendants the option of judicial factfinding as to some facts (*i.e.*, sentencing facts), say, because of fairness concerns, will also have to offer the defendant a second sentencing jury—just as Kansas has done. I therefore turn to that alternative.

2

The second way to make sentencing guidelines *Apprendi*-compliant would be to require at least two juries for each defendant whenever aggravating facts are present: one jury to determine guilt of the crime charged, and an additional jury to try the disputed facts that, if found, would aggravate the sentence. Our experience with bifurcated trials in the capital punishment context suggests that requiring them for run-of-the-mill sentences would be costly, both in money and in judicial time and resources. Cf. Kozinski & Gallagher, Death: The Ultimate Run-On Sentence, 46 Case W. Res. L. Rev. 1, 13–15, and n. 64 (1995) (estimating the costs of each capital case at around $1 million more than each noncapital case); Tabak, How Empirical Studies Can Affect Positively the Politics of the Death Penalty, 83 Cornell L. Rev. 1431, 1439–1440 (1998)

BREYER, J., dissenting

Other defendants may be hurt if a "single-jury-decides-all" approach makes them more reluctant to risk a trial—perhaps because they want to argue that they did not know what was in the cocaine bag, that it was a small amount regardless, that they were unaware a confederate had a gun, etc. See Bibas, 110 Yale L. J., at 1100 ("Because for many defendants going to trial is not a desirable option, they are left without any real hearings at all"); id., at 1151 ("The trial right does little good when most defendants do not go to trial").

At the least, the *greater* expense attached to trials and their greater complexity, taken together in the context of an overworked criminal justice system, will likely mean, other things being equal, fewer trials and a greater reliance upon plea bargaining—a system in which punishment is set not by judges or juries but by advocates acting under bargaining constraints. At the same time, the greater power of the prosecutor to control the punishment through the charge would likely weaken the relation between real conduct and real punishment as well. See, e.g., Schulhofer, 29 Am. Crim. L. Rev., at 845 (estimating that evasion of the proper sentence under the Federal Guidelines may now occur in 20%–35% of all guilty plea cases). Even if the Court's holding does not further embed plea-bargaining practices (as I fear it will), its success depends upon the existence of present practice. I do not understand how the Sixth Amendment could *require* a sentencing system that will work in practice only if no more than a handful of defendants exercise their right to a jury trial.

The majority's only response is to state that "bargaining over elements . . . probably favors the defendant," *ante,* at 15, adding that many criminal defense lawyers favor its position, *ante,* at 16. But the basic problem is not one of "fairness" to defendants or, for that matter, "fairness" to prosecutors. Rather, it concerns the greater fairness of a

BREYER, J., dissenting

legislatures might, for example, rewrite their criminal codes, attaching astronomically high sentences to each crime, followed by long lists of mitigating facts, which, for the most part, would consist of the absence of aggravating facts. *Apprendi,* 530 U. S., at 541–542 (O'CONNOR, J., dissenting) (explaining how legislatures can evade the majority's rule by making yet another labeling choice). But political impediments to legislative action make such rewrites difficult to achieve; and it is difficult to see why the Sixth Amendment would require legislatures to undertake them.

It may also prove possible to find combinations of, or variations upon, my first three options. But I am unaware of any variation that does not involve (a) the shift of power to the prosecutor (weakening the connection between real conduct and real punishment) inherent in any charge offense system, (b) the lack of uniformity inherent in any system of pure judicial discretion, or (c) the complexity, expense, and increased reliance on plea bargains involved in a "two-jury" system. The simple fact is that the design of any fair sentencing system must involve efforts to make practical compromises among competing goals. The majority's reading of the Sixth Amendment makes the effort to find those compromises—already difficult—virtually impossible.

## II

The majority rests its conclusion in significant part upon a claimed historical (and therefore constitutional) imperative. According to the majority, the rule it applies in this case is rooted in "longstanding tenets of common-law criminal jurisprudence," *ante,* at 5: that every accusation against a defendant must be proved to a jury and that "'an accusation which lacks any particular fact which the law makes essential to the punishment is . . . no accusation within the requirements of the common law, and it is no accusation in reason,'" *ibid.* (quoting Bishop, Criminal

BREYER, J., dissenting

victed"); 1 T. Starkie, Criminal Pleading 68 (2d ed. 1822)
(the indictment must state "the criminal nature and de-
gree of the offence, which are conclusions of law from the
facts; and also the particular facts and circumstances
which render the defendant guilty of that offence").

Neither Bishop nor any other historical treatise writer,
however, disputes the proposition that judges historically
had discretion to vary the sentence, within the range
provided by the statute, based on facts not proved at the
trial. See Bishop, *supra*, §85, at 54 ("[W]ithin the limits of
any discretion as to the *punishment* which the law may
have allowed, the judge, when he pronounces sentence,
may suffer his discretion to be influenced by matter shown
in aggravation or mitigation, not covered by the allega-
tions of the indictment"); K. Stith & J. Cabranes, Fear of
Judging: Sentencing Guidelines in the Federal Courts 9
(1998). The modern history of pre-guidelines sentencing
likewise indicates that judges had broad discretion to set
sentences within a statutory range based on uncharged
conduct. Usually, the judge based his or her sentencing
decision on facts gleaned from a presentence report, which
the defendant could dispute at a sentencing hearing. In
*the federal* system, for example, Federal Rule of Criminal
Procedure 32 provided that probation officers, who are
employees of the Judicial Branch, prepared a presentence
report for the judge, a copy of which was generally given to
the prosecution and defense before the sentencing hearing.
See Stith & Cabranes, *supra*, at 79–80, 221, note 5. See
also *ante*, at 2 (O'CONNOR, J., dissenting) (describing the
State of Washington's former indeterminate sentencing
law).

In this case, the statute provides that kidnaping may be
punished by up to 10 years' imprisonment. Wash. Rev.
Code Ann. §§9A.40.030(3), 9A.20.021(1)(b) (2000). Modern
structured sentencing schemes like Washington's do not
change the statutorily fixed maximum penalty, nor do

BREYER, J., dissenting

sentencing range.

Given history's silence on the question of laws that structure a judge's discretion within the range provided by the legislatively labeled maximum term, it is not surprising that our modern, pre-*Apprendi* cases made clear that legislatures could, within broad limits, distinguish between "sentencing facts" and "elements of crimes." See *McMillan,* 477 U. S., at 85–88. By their choice of label, legislatures could indicate whether a judge or a jury must make the relevant factual determination. History does not preclude legislatures from making this decision. And, as I argued in Part I, *supra,* allowing legislatures to structure sentencing in this way has the dual effect of enhancing and giving meaning to the Sixth Amendment's jury trial right as to core crimes, while affording additional due process to defendants in the form of sentencing hearings before judges—hearings the majority's rule will eliminate for many.

Is there a risk of unfairness involved in permitting Congress to make this labeling decision? Of course. As we have recognized, the "tail" of the sentencing fact might "wa[g] the dog of the substantive offense." *McMillan, supra,* at 88. Congress might permit a judge to sentence an individual for murder though convicted only of making an illegal lane change. See *ante,* at 10 (majority opinion). But that is the kind of problem that the Due Process Clause is well suited to cure. *McMillan* foresaw the possibility that judges would have to use their own judgment in dealing with such a problem; but that is what judges are there for. And, as Part I, *supra,* makes clear, the alternatives are worse—not only practically, but, although the majority refuses to admit it, constitutionally as well.

Historic practice, then, does not compel the result the majority reaches. And constitutional concerns counsel the opposite.

Cite as: 542 U. S. ___ (2004)          19

BREYER, J., dissenting

as the majority interprets the Sixth Amendment to do, prevents the legislature from seeking sentencing systems that are consistent with, and indeed may help to advance, the Constitution's greater fairness goals.

To say this is not simply to express concerns about fairness to defendants. It is also to express concerns about the serious practical (or impractical) changes that the Court's decision seems likely to impose upon the criminal process; about the tendency of the Court's decision to embed further plea bargaining processes that lack transparency and too often mean nonuniform, sometimes arbitrary, sentencing practices; about the obstacles the Court's decision poses to legislative efforts to bring about greater uniformity between real criminal conduct and real punishment; and ultimately about the limitations that the Court imposes upon legislatures' ability to make democratic legislative decisions. Whatever the faults of guidelines systems—and there are many—they are more likely to find their cure in legislation emerging from the experience of, and discussion among, all elements of the criminal justice community, than in a virtually unchangeable constitutional decision of this Court.

## V

Taken together these three sets of considerations, concerning consequences, concerning history, concerning institutional reliance, leave me where I was in *Apprendi, i.e.,* convinced that the Court is wrong. Until now, I would have thought the Court might have limited *Apprendi* so that its underlying principle would not undo sentencing reform efforts. Today's case dispels that illusion. At a minimum, the case sets aside numerous state efforts in that direction. Perhaps the Court will distinguish the Federal Sentencing Guidelines, but I am uncertain how. As a result of today's decision, federal prosecutors, like state prosecutors, must decide what to do next,

Cite as: 542 U. S. ____ (2004)          21

BREYER, J., dissenting

certainty, I would not proceed further piecemeal; rather, I would call for further argument on the ramifications of the concerns I have raised. But that is not the Court's view.

For the reasons given, I dissent.